## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAUREN WOLF, on behalf of herself and on behalf of all others similarly situated, | ) ) ) | |
| *Plaintiff*, | ) | **Case No.** |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| HAND & STONE FRANCHISE LLC and HAND & STONE FRANCHISE CORP. | ) ) | |
| *Defendants*. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Lauren Wolf ("Plaintiff"), individually and on behalf of all others similarly situated, by and through undersigned counsel, hereby allege the following against Defendants Hand & Stone Franchise LLC and Hand & Stone Franchise Corp. (collectively, "Defendants"). Facts pertaining to Plaintiff and her personal experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are alleged based upon the investigation of counsel and upon information and good faith belief.

## NATURE OF THE ACTION

1. This is a class action lawsuit for damages and injunctive relief arising from Defendants' unlawful practice of disclosing Plaintiff's and Class members' individually identifiable health information ("IIHI") and protected health information ("PHI") (referred to herein collectively as "Private Information") to unauthorized third parties including, but not limited to, Meta Platforms, Inc., d/b/a Facebook ("Meta" or "Facebook"), Google, Inc. ("Google"), Amazon.com, Inc. ("Amazon"), and TikTok ("TikTok") (collectively, the "Information Recipients").

2.      Defendants own, control, and maintains https://handandstone.com/ (referred to herein as the "Website"), a website which requires individuals to share highly sensitive Private Information in order to receive a variety of medical treatments and prescription medication.

3.      Defendants installed and implemented "pixels" and similar tracking technologies such as those made available by the Information Recipients (referred to herein as the "Tracking Technologies") on the Website.

4.      The implementation of Tracking Technologies to monitor users' information on the Website is the result of centralized directives and policies established by Defendants.  The Privacy Policy on the Website states: "We reserve the right. . . to amend this Privacy Policy at our discretion, at any time. When we make changes to this Privacy Policy, we will post the updated policy on our websites and update the Effective Date. Changes to this Privacy Policy are effective when they are posted on this page."[1]  Additionally, Defendants' franchise website states: "If we make changes to our Privacy Policy, we will post those changes on this page."  These statements confirm that all updates or changes—including those related to tracking technologies—are determined centrally and communicated to users through official Website updates.[2]

5.      Invisible to the naked eye, each of the Tracking Technologies collects and transmits information from the user's browser to the corresponding Information Recipient as the user enters information into the Website. The Tracking Technologies secretly enable the unauthorized transmission and disclosure of Plaintiff's and Class Members' Private Information to the Information Recipients by Defendants.

---

[1] *Privacy Policy*, *available at* https://handandstone.com/legal/privacy-policy/ (last visited October 6, 2025)

[2] *Privacy Policy*, *available at* https://handandstone.com/franchise/privacy-policy/ (last visited October 6, 2025)

6.      Through the use of Tracking Technologies, Defendants' Website directs Plaintiff's and Class members' communications, including Private Information, to automatically be sent to the servers of the corresponding Information Recipients. This occurs on every webpage on which Defendants installed the Tracking Technologies, including pages that are generally accessible even without an account with Defendants.

7.      Thus, operating as implemented by Defendants, the Tracking Technologies allow the Private Information that Plaintiff and Class members submit via the Website in confidence to be unlawfully disclosed to the Information Recipients alongside the individual's unique Google and/or Facebook identifiers, including his or her Google account and other identifying information.

8.      While Defendants willfully and intentionally incorporated the Tracking Technologies into the Website, Defendants failed to affirmatively disclose to Plaintiff or Class members that they shared their sensitive and confidential assessment responses via the Website with third parties.

9.      Healthcare patients simply do not anticipate that their trusted healthcare provider will send Private Information collected via its website to undisclosed third parties. By employing third-party trackers, Defendants effectively bartered the private medical information of its patients for more detailed analytics of its users to increase its revenues and profits.

10.     Despite numerous warnings from federal regulators (and several Federal Trade Commission enforcement actions against telehealth companies for similar conduct) about the data privacy risks of using third-party tracking technologies,[3] Defendants designed and maintained

---

[3] *See, e.g.*, Heather Landi, FIERCE HEALTHCARE, *Regulators Warn Hospitals and Telehealth Companies about privacy risks of Meta, Google Tracking Tech*, (July 21, 2023), *available at* https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google (last visited Aug. 5, 2025) (noting that the FTC and

their Website so that users would be required to submit Private Information in order to research treatment options, schedule consultations, and schedule appointments to receive treatment. In doing so, Defendants violated numerous federal and state laws and breached numerous common law duties to its customers.

11. Defendants owed common law, contractual, statutory, and regulatory duties to keep Plaintiff's and Class members' Private Information safe, secure, and confidential. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private Information, Defendants assumed legal and equitable duties to patients to protect and safeguard their Private Information from unauthorized disclosure.

12. Defendants, however, failed in their obligations and promises by utilizing the Tracking Technologies on the Website as described herein, knowing that such technology would transmit and share Plaintiff's and Class members' Private Information with the Information Recipients.

13. Defendants breached their obligations to Plaintiff and the Class members in one or more of the following ways: (1) failing to adequately review their marketing programs and web-based technology to ensure the Website was safe and secure; (2) failing to remove or disengage technology that was known and designed to share patients' Private Information; (3) failing to obtain the consent of patients, including Plaintiff and Class members, to disclose their Private Information to Facebook or others; (4) failing to take steps to block the transmission of Plaintiff's and Class members' Private Information through the Tracking Technologies; (5) failing to warn

_____

the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps).

Plaintiff and Class members of such sharing and disclosures; and (6) otherwise failing to design and monitor the Website to maintain the confidentiality and integrity of patients' Private Information.

14.     Defendants intentionally chose to put their profits over the privacy of their users. The unilateral disclosure of users' Private Information in this manner is unquestionably a violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), among other statutory and common laws.

15.     The disclosure of Plaintiff's and Class Members' Private Information via the Tracking Technologies contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information. [4]

16.     The HIPAA Privacy Rule sets forth policies to protect all IIHI that is held or transmitted by a covered entity such as Defendants. There are eighteen HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Facebook account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.[5]

---

[4]     HHS.gov, The HIPAA Privacy Rule, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html  (last visited March 24, 2025).
[5] *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Aug. 5, 2025) (HIPAA Identifiers include name; address (all geographic subdivisions smaller than state, including street address, city county, and zip code); all elements (except years) of dates related to an individual (including birthdate, admission date, discharge date, date of death, and exact age); telephone numbers; email address; medical record number; health plan beneficiary number; account number; device identifiers and serial numbers; web URL; Internet Protocol (IP) address; and any other characteristic that could uniquely identify the individual).

17.     While healthcare entities regulated under HIPAA may use third-party tracking tools, such as Google Analytics, they can do so only in a very limited way to perform analysis on data key operations.

18.     Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendants are simply ***not*** permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third party without express and informed consent.

19.     Lest there be any doubt of the illegal nature of Defendants' practice, the Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") has made clear in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (the "HHS OCR Bulletin"), that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[6]

20.     Further reiterating the importance of and necessity for data security and privacy concerning health information, the Federal Trade Commission ("FTC") recently published a bulletin entitled *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, in which it noted:

> Health information is not just about medications, procedures, and diagnoses. ***Rather, it is anything that conveys information—or enables an inference—about a consumer's health***. Indeed, [recent FTC enforcement actions involving] *Premom*, *BetterHelp*, *GoodRx* and *Flo Health* **make clear that the fact**

---

[6] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html, HHS.GOV (emphasis added) (last visited March 24, 2025).

*that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information.*[7]

21.     The FTC is unequivocal in its stance as it informs—in no uncertain terms—healthcare companies that they should **not** use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.**
>
> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking Pixels on websites or software development kits on apps, watch out.***

22.     Recent FTC enforcement actions such as *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that ***may run afoul of the FTC Act if they violate privacy promises or if the company fails to get consumers' affirmative express consent for the disclosure of sensitive health information***.[8]

23.     Plaintiff brings this lawsuit on behalf of similarly situated individuals whose sensitive Private Information was intentionally, recklessly, and/or negligently disclosed to the Information Recipients through Defendants' unauthorized utilization of the Tracking Technologies.

---

[7] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (March 24, 2025) (emphasis added), available at https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last visited March 24, 2025).

[8] *Id.* (emphasis added) (further noting that *GoodRx* & *Premom* underscore that this conduct may also violate the Health Breach Notification Rule, which requires notification to consumers, the FTC and, in some cases, the media, of disclosures of health information without consumers' authorization.

24. The Private Information that the Tracking Technologies gathered from Defendants' Website and sent to the Information Recipients included the Private Information that Plaintiff and Class members submitted to Defendants' Website, including for example, particular health conditions, types of health treatment sought and/or received, insurance information, and other confidential IIHI and PHI.

25. The Information Recipients in turn use Plaintiff's and Class members' Private Information for business purposes, including using such information to improve advertisers' ability to target specific demographics and selling such information to third-party marketers who target Plaintiff and Class members online (*i.e.*, through their social media and personal accounts).

26. Plaintiff and Class members have suffered injury as a result of Defendants' conduct. These injuries include (1) invasion of privacy, (2) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the transmissions of her Private Information to the Information Recipients, (3) loss of the benefit of the bargain, (4) diminution of value of the disclosed Private Information, (5) statutory damages, and (6) the continued and ongoing risk to her Private Information.

27. Plaintiff seeks to remedy these harms and bring causes of action for: (1) negligence; (2) invasion of privacy; (3) breach of confidence; (4) unjust enrichment; and (5) violations of the Electronics Communication Privacy Act ("ECPA"), 18 U.S.C. § 2511(1).

## PARTIES

### A. Plaintiff Lauren Wolf

28. Plaintiff Wolf is a citizen of the State of Texas residing in Fort Worth and brings this action in an individual capacity and on behalf of all others similarly situated. Plaintiff Wolf is and has at all relevant times been a resident of Texas.

29.     On multiple occasions beginning on or around May 2025 until June 2025, Plaintiff Wolf utilized Defendants' Website on her personal electronic devices including her phone and laptop to research services and providers and to schedule appointments. Plaintiff's most recent visit to Defendants' website was in June 2025.

30.     Plaintiff Wolf visited Defendants' Website to search for pregnancy-oriented massage and facials services as well as potential injectable, toning, and hair removal treatments.

31.     Plaintiff visited the webpages for each of these services on the Website, including the Massage,[9] Facials,[10] Toning,[11] Injectables,[12] and Hair Removal[13] webpages. She also visited the Book an Appointment webpage[14] to check the pricing of each of the services offered, check the available timings at her desired location, and book appointments. To book her appointment, Plaintiff provided Defendants with personal information including her first name, last name, email address, date of birth, and credit card information.

32.     While Plaintiff was a user of Defendants' services, she never consented to or authorized the use of her Private Information by third parties or to Defendants' enabling third parties to access, interpret, and use such Private Information. Plaintiff was not aware that Defendants obtained her Private Information from her use of the Website at the time.

33.     Plaintiff Wolf had a Google, Facebook, TikTok, and Amazon account while she used Defendants' services, and she accessed Defendants' Website while logged into her accounts

---

[9] *Massage*, *available at* https://handandstone.com/massage/ (last visited October 16, 2025)

[10] *Facials*, *available at* https://handandstone.com/facials/ (last visited October 16, 2025)

[11] *Toning*, *available at* https://handandstone.com/body-toning/ (last visited October 16, 2025)

[12] *Injectables*, *available at* https://handandstone.com/injectables/ (last visited October 16, 2025)

[13] *Hair Removal*, *available at* https://handandstone.com/hair-removal/ (last visited October 16, 2025)

[14] *Book an Appointment, available at* https://handandstone.com/locations/ (last visited October 16, 2025)

on the same device. Each time Plaintiff Wolff accessed Defendants' Website while logged into her Google, Facebook, or TikTok, and Amazon account on the same device, Defendants obtained accessed to her Private Information via "pixels" embedded on the Website. Plaintiff Wolff was not aware at the time that being logged in to her Google, Facebook, TikTok, or Amazon accounts while accessing Defendants' Website would facilitate or enable Defendants to disclose her Private Information to third parties.

34.     The Private Information that Defendants obtained from Plaintiff's use of Defendants' website and disclosed to the Information Recipients included unique user identifiers for her Google, Facebook, TikTok and Amazon accounts, which includes her first name, last name, e-mail address, and browsing activity on the Website. During her research, Plaintiff viewed video content posted on Defendants' website and social media accounts.

35.     After unknowingly providing her Private Information to Defendants through the Website, Plaintiff Wolf immediately began seeing targeted ads for skincare, healthcare, other medical spas and general wellness services, botox and other injectables, and GLP-1 medications from businesses that she had never visited before as she scrolled through her social media accounts.

36.     Plaintiff trusted that the Private Information that she unknowingly provided to Defendants would be safeguarded according to Defendants' policies, industry standards, and state and federal law.

37.     Plaintiff was injured by Defendants' unauthorized disclosure of her confidential medical information. Defendants' actions subjected her to unsolicited targeted advertising related to the specific medical services she received and caused significant mental distress arising from the implication that advertisers were aware of her medical conditions and the fear that her friends, family, or colleagues might see those advertisements and thereby learn of her conditions.

Additionally, Plaintiff lost the benefit of her bargain with Defendants. Plaintiff created an account with Defendants and used Defendants' website to schedule appointments believing that Defendants would keep her Private Information confidential and would not have done so had she known Defendants' actual practices. Finally, Defendants' practice of sharing Plaintiff's Private Information has diminished the value of the disclosed Private Information.

**B.    Defendants**

38.    Defendant Hand & Stone Franchise LLC is a limited liability company incorporated in New Jersey with its principal place of business in 1210 Northbrook Drive, Suite 150, Trevose, PA 19053.

39.    Defendant Hand & Stone Franchise Corp. is a corporation incorporated in New Jersey with its principal place of business in 1210 Northbrook Drive, Suite 150, Trevose, PA 19053.

40.    Defendants offer a variety of medical treatments, including Botox, wrinkle relaxers, facial toning, microcurrent toning, hair removal, and deep tissue massages.

## JURISDICTION & VENUE

41.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

42.    This Court has personal jurisdiction over Defendants because they operate and maintain their principal place of business in this District. Further, Defendants are authorized to

and regularly conducts business in this District and make decisions regarding corporate governance and management of the Website in this District, including decisions regarding the privacy of patients' IIHI and PHI and the incorporation of the Tracking Technologies.

43.     Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendants' governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class members' Private Information; Defendants' principal place of business is located in this District; Defendants collect and redistribute Class members' Private Information in this District; and Defendants caused harm to Class members residing in this District.

## FACTUAL ALLEGATIONS

44.     Defendants have utilized the Tracking Technologies since at least January 2022.

45.     The implementation of Tracking Technologies to monitor Plaintiff's and Class members' Private Information on the Website is the result of centralized directives and policies established by Defendants. The Website states: "We reserve the right. . . to amend this Privacy Policy at our discretion, at any time. When we make changes to this Privacy Policy, we will post the updated policy on our websites and update the Effective Date. Changes to this Privacy Policy are effective when they are posted on this page."[15] Additionally, Defendants' franchise website states: "If we make changes to our Privacy Policy, we will post those changes on this page."[16] These statements confirm that all updates or changes—including those related to tracking

---

[15] *Privacy Policy*, *available at* https://handandstone.com/legal/privacy-policy/ (last visited October 6, 2025)

[16] *Privacy Policy*, *available at* https://handandstone.com/franchise/privacy-policy/ (last visited October 6, 2025)

technologies—are determined centrally and communicated to users through official website updates.

46.    Defendants installed the Tracking Technologies on many (if not all) of the pages within the Website and programmed or permitted those pages to surreptitiously share patients' private and protected communications to Defendants with the Information Recipients—communications that included Plaintiff's and Class members' Private Information.

47.    In order to understand Defendants' unlawful data-sharing practices, it is important to first understand some of the basic web design before delving into the Tracking Technologies at issue.

### A.    *Communicating Over The Internet: HTTP Requests, HTTP Responses, and Cookies*

48.    Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.

49.    Each "client-side" device (such as a computer, tablet, or smartphone) typically accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

50.    On the other side of the equation, every website is hosted by a computer "server" that holds the website's contents. The entity or entities) in charge of the website exchange communications with users' client devices as the users' web browsers query the server through the Internet.

51.    Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") requests and HTTP or HTTPS responses. Any given browsing session may consist of the transmission of thousands of individual HTTP requests

and HTTP responses, along with corresponding "cookies." Important concepts here are detailed below:

a.   **HTTP request**: an electronic communication sent from the client device to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular Universal Resource Locator ("URL") (i.e., web address), GET Requests can also send data to the host server embedded inside the URL and can include cookies. POST Requests can send a large amount of data outside of the URL (for instance, uploading a PDF to file a motion to a court).

b.   **Cookies**: "small files of information that a web server generates and sends to a web browser. Web browsers store the cookies they receive for a predetermined period of time, or for the length of a user's session on a website. They attach the relevant cookies to any future requests the user makes of the web server. Cookies help inform websites about the user, enabling the websites to personalize the user experience. For example, ecommerce websites use cookies to know what merchandise users have placed in their shopping carts."[17] A stored cookie is sent with HTTP requests from client devices to the host server. Once received, a cookie typically remains on the client-side browser and is used by the server to associate website activity with a specific user. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

---

[17]   *See    What    are    cookies?    |    Cookies    definition*, Cloudflare.com, *available    at* https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited August 1, 2025).

c. **HTTP response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP request. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data.

52. A user's HTTP request asks the server hosting a website to retrieve certain information, such as a set of health screening questions. The HTTP response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the user's screen as they navigate a website.

53. Every website is comprised of Markup and "Source Code." Source Code is a simple set of instructions that commands the website user's browser to take certain actions when the webpage first loads or when a specified event triggers the code. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP requests quietly executed in the background without notifying the web browser's user.

**B.    The Tracking Technologies Share Users' Actions on the Website Along with Identifying Information**

54. The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website user's communications and inputs to the corresponding Information Recipient much like a traditional wiretap. When individuals visit Defendants' Website via an HTTP request to Defendants' server, Defendants' server sends an HTTP response (including the Markup) that displays the webpage visible to the user, along with Source Code (including the Tracking Technologies). This occurs whether the user has an account with Defendants or not.

55. Thus, Defendants are, in essence, handing their patients a tapped phone. Once the webpage is loaded into the patient's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept

those communications intended only for Defendants and transmit those communications to the corresponding Information Recipient.

56.     Third parties like the Information Recipients place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can uniquely identify the user associated with the information intercepted (in this case, highly sensitive Private Information).

57.     Defendants intentionally configured Tracking Technologies installed on their Website to capture both the "characteristics" of individual patients' communications with the Defendants' Websites (i.e., their IP addresses, unique account identifiers and related information, cookie identifiers, device identifiers, and account numbers) and the "content" of these communications (i.e., the buttons, links, pages, and tabs they click and view).

### C.     Google's Tracking Technologies: Google Analytics and Signals

58.     Google is one of the world's largest companies, with annual revenues approaching $100 billion a year.[18] Much of this revenue is derived from advertising across platforms, accounting for over 75% of the company's revenue.

59.     In conjunction with its advertising business, Google encourages and promotes entities and website owners, such as Defendants, to utilize a Tracking Technology called Google Analytics to gather, identify, target, and market products and services to individuals.

---

[18] *Alphabet Announces Fourth Quarter And Fiscal Year 2024 Results*, SEC.gov, *available at* https://www.sec.gov/Archives/edgar/data/1652044/000165204425000010/googexhibit991q4202 4.htm (last visited March 26, 2025).

60.     Google Analytics allows businesses to send web events, such as clicks, form submissions, and other user actions performed by the user on the Website, from their own servers to Google and other third parties.[19]

61.     Google Analytics accomplishes this through a piece of code that a website owner elects to embed in their website. When a user visits a page with the Google Analytics code installed, the user's browser executes the code and allows Google to collect voluminous information about that user and their interactions with the site.[20]

62.     Google Analytics is automatically configured to capture a large amount of data, such as when a user visits a particular webpage, that webpage's URL and metadata, button clicks, etc.[21]

63.     Advertisers, such as Defendants, can track other user actions and can create their own tracking parameters by building a "custom dimension."[22] These are descriptive attributes (such as user type, membership level, or product category) that you define and collect in addition

---

[19] "Once you've installed the tracking code and have elected to share your data, the Benchmarking Service accrues data from all the sites and pages on which you've placed the Google Analytics tracking code." *See Using the Tracking Code*, Google.com, *available at* https://support.google.com/analytics/answer/1011401?hl=en&sjid=50690585228022209555-NA (last visited March 24, 2025).

[20] "Google signals are session data from sites and apps that Google associates with users who have signed in to their Google accounts, and who have turned on Ads Personalization. This association of data with these signed-in users is used to enable cross-device remarketing, and cross-device key events export to Google Ads." *See [GA4] Activate Google signals for Google Analytics properties*, Google.com, *available at* https://support.google.com/analytics/answer/9445345?hl=en#zippy=%2Cin-this-article    (last visited March 24, 2025).

[21]     *[GA4]    Data    Collection*,    Google.com,    *available    at* https://support.google.com/analytics/answer/11593727?hl=en (last visited March 26, 2025).

[22]     *[GA4]    About    Custom    Events    And    Metrics*, Google.com, *available    at* https://support.google.com/analytics/answer/14240153?hl=en (last visited March 26, 2025); *see also    [GA4]    Create    User-Scoped    Custom    Dimensions*, Google.com, *available    at* https://support.google.com/analytics/answer/14239618?hl=en&ref_topic=11151952&sjid=11867 313698080218124-NA#zippy=%2Canalyze-the-custom-dimension-in-a-report%2Canalyze-the-custom-dimension-in-an-exploration%2Cbuild-an-audience-using-the-dimension.

to the default dimensions provided by Google Analytics. They allow you to segment and analyze your data in ways that are not possible with standard fields.

64.     Google Signals is a cross-device tracking tool offered by Google. It works in conjunction with data gathered by Analytics.

65.     When a visitor has a Google profile, Google Signals allows the information collected to be associated with a user's Google account as well if ad personalization is turned on. This feature is on by default.[23] This associates the data collected by Google Analytics with their name and Google profile, *i.e.*, their real-world identity. Likewise, Google maintains "shadow profiles" on users without Google accounts and links the information collected to the user's real-world identity using their shadow profile.[24]

66.     Importantly, "Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service."[25] Google is extremely clear about this and goes on to state that "Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered."[26]

---

[23] *Ads Personalization Settings In Google's Publisher Ad Tags*, Google.com, *available at* https://support.google.com/adsense/answer/7670312?hl=en google.com (last visited March 26, 2025).

[24] *Google's Shadow Profile: A Dossier Of Consumers Online And Real World Life*, Gov.UK (Feb. 2019), *available at* https://assets.publishing.service.gov.uk/media/5e1c4985e5274a06b7450a13/Oracle_-_Response_to_SoS_-_Appendix_4_-_Google_Shadow_Profiles.pdf (last visited March 26, 2025).

[25] *Google, HIPAA And Google Analytics*, Google.com, *available at* https://support.google.com/analytics/answer/13297105?hl=en (last visited March 24, 2025).

[26] *Id.*

### D. *Facebook's Tracking Technologies: The Meta Pixel*

67.     Facebook is a massive social media website, claiming over 3 billion monthly users, making it the most used social media platform worldwide.[27]

68.     Facebook offers their own version of a Tracking Technology that feeds user-generated information back to Facebook to be linked with users' profiles for marketing purposes (the "Meta Pixel").

69.     The Meta Pixel is a piece of code that, once configured on a website, "will log when someone takes an action on [the website owner's] website . . . [the website owner will] also have options to reach those customers again through future Meta ads." [28] Thus, the Meta Pixel functions essentially identically to Google Analytics.

70.     Facebook states that website owners can use the Meta Pixel to "make sure [their] ads are shown to the right people"; "drive more sales"; and "measure the results of [their] ads."[29] The Meta Pixel allows third parties to track a user as they interact with a website, including how long a person spends on a particular webpage, which buttons the person clicks, which pages they view, the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), and more.

---

[27] *31 Facebook statistics marketers should know in 2025*, Sprout Social, *available at* https://sproutsocial.com/insights/facebook-stats-for-marketers/ (last visited August 1, 2025).
[28]     *About      Meta      Pixel*,      Facebook.com,      *available      at* https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited August 1, 2025).
[29] *Id.*

71.     The Meta Pixel collects and retains a wide range of identifying information about website visitors, including IP addresses and personal information including names, phone numbers, dates of birth, and addresses.[30]

### E.     The Implementation of the Tracking Technologies on the Website

72.     The Tracking Technologies are programmable, meaning that Defendants control which of the webpages on the Website contain the Tracking Technologies, and which events are tracked and transmitted to the Information Recipients.

73.     A user's web browser executes the Tracking Technologies' code via instructions within each webpage of Defendants' Website to communicate certain information (within parameters set by Defendants) directly to the corresponding Information Recipients.

74.     When a user accesses a webpage that is hosting the Tracking Technologies, like those on the Website, their communications with the Website are instantaneously and surreptitiously duplicated and sent to Google's or Facebook's servers—traveling from the user's browser to the servers.

75.     This second, secret transmission contains the original GET request sent to the Website, along with additional data that Defendants configured the Tracking Technologies to collect. This transmission is initiated by the Tracking Technologies' code and concurrent with the communications with the Website. Two sets of code are thus automatically run as part of the browser's attempt to load and read Defendants' Website—Defendants' own code and Google's and Facebook's embedded code.

---

[30] *Types of Data the Meta Pixel Collect and Retain About Website Visitors*, Captaincompliance.com (Feb. 16, 2025), *available at* https://captaincompliance.com/education/types-of-data-the-meta-pixel-collect-and-retain-about-website-visitors/.

76.    Accordingly, during the same transmissions, the Website routinely provides the Information Recipients with its patients' Google Account IDs, IP addresses, and/or device IDs and the other information they input into Defendants' Website, including but not limited to their medical searches, location information, treatment requests, insurance information (or lack thereof), and the webpages they view. This is precisely the type of identifying information that HIPAA requires healthcare providers to de-identify to protect the privacy of patients.[31] Plaintiff's and Class Members' identities can be easily determined based on Google or Facebook account identifiers, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

77.    After intercepting and collecting this information, the Information Recipients process, analyze, and assimilate it into datasets for use by advertisers to target individuals.

78.    Data collected through the Tracking Technologies is linked to the user's accounts with the Information Recipients, which generally contain a wide range of demographic and other information about the user, including pictures, personal interests, work history, and other details.

79.    Even if a user lacks an account with an information recipient, the data collected by the Tracking Technologies is linked with shadow profiles maintained by the Information Recipients that contain a similar set of information about the user.

80.    Importantly, the Private Information disclosed via the Tracking Technologies allows the Information Recipients to know the identity of a specific patient as well as the fact that they are seeking confidential medical care and the type of medical care being sought. The Information Recipients then use that information to sell advertising to Defendants and other

---

[31] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS.gov, *available at* https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited Aug. 5, 2025).

advertisers and/or sell that information to marketers who will online target Plaintiff and Class members.

81.    The Tracking Technologies are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting—i.e., serving online advertisements to people who have previously engaged with a business's website—and other marketing.

82.    Defendants used the data they collected from Plaintiff and Class members, without her consent, in an effort to improve their advertising and bolster their revenues.

**F.    *The Tracking Technologies Shared Plaintiff's Sensitive Private Information with Google and Facebook***

83.    Plaintiff and Class members submitted Private Information to Defendants' Website in order to participate in health assessments and obtain health-related services offered through the Website.

84.    Concurrently, this information was communicated from the Website (via the Tracking Technologies) to the Information Recipients.

85.    When a user visits the Hand & Stone Website, the Tracking Technologies load the user's unique user ID from cookies stored in their browser. The Tracking Technologies track the user's activities on the Website and correlate that data with the user's real-world identity and their activities across other sites and platforms.

86.    For instance, the Website notifies Google which pages the user visits, with URL specific information transmitted. For instance, below, the pixel displays to Google that the user is viewing the page "Massages & Facials Near You." See the specific traffic in line dt:



87.     The Website notifies TikTok that a user is viewing a page, with URL specific information transmitted. For instance, below, the pixel displays to TikTok that the user is viewing the homepage of the Website. See the specific traffic in line event and line url:



88.     The Website notifies TikTok that a user is viewing a page, with URL specific information transmitted. For instance, below, the pixel displays to TikTok that the user is viewing the homepage of the Website. See the specific traffic in line ev and line dl:



89.     The Website also notifies Amazon when a user views a page on the website. See the specific traffic in line event:



90.     When a user opts to book an appointment, they are asked to select a treatment location. The Website notifies Google that the visitor is viewing (line t) the webpage to choose a treatment location (line dt):



91.     Similarly, the Website sends TikTok information that a user viewed the webpage for treatment locations. This is demonstrated through lines event and url below:



92.     The Website also sends Facebook information that a user viewed the webpage for treatment locations. This is demonstrated through lines ev and dl below:



93.     The Website also sends data to Google when a user is trying to select a location to book an appointment. For instance, if the user types in the ZIP code 94111, in San Francisco, the text box drops down to automatically suggest "San Francisco, CA, USA" to the user. This data is

then sent to the Google Maps API, suggesting the ZIP code to city/country conversion is based on

Google Maps.



94.    In sum, each of the Information Recipients' pixels contained and disclosed

Plaintiff's and Class members' Private Information via Defendants. Plaintiff and Class members

provided their Private Information to Defendants by browsing the Website, reviewing conditions

and available treatments, scheduling appointments, purchasing prescriptions, researching issues, and, at all times throughout this process, had a reasonable expectation of privacy in the Private Information Defendants were collecting, including that Defendants would ensure that such Private Information remain secure and protected and only utilized for limited medical and health purposes.

95.     Defendants deposit cookies named _ga and _gid onto Plaintiff's and Class Members' computing devices. These are cookies associated with Google but which Defendants deposit on Plaintiff's and Class Members' computing devices by classifying them as first-party cookies.

### G.     *Defendants' Use of the Tracking Technologies Violated Users' Expectation of Privacy*

96.     Defendants breached Plaintiff's and Class members' right to privacy by unlawfully disclosing their Private Information to the Information Recipients. Specifically, Plaintiff and Class members had a reasonable expectation of privacy in the Private Information that they shared with Defendants.

97.     Defendants further made express and implied promises to protect Plaintiff's and Class members' Private Information and maintain the privacy and confidentiality thereof.

98.     A user of the Website is not asked to review Defendants' privacy practices before scheduling a consultation, a process which requires a user to provide their full name, email address, phone number, and description of their medical issue.

99.     Defendants' Privacy Policy lists the ways in which they use a user's information, including through the use of "Log Files." The policy states:

> We use log files for error diagnostics, session management, and determining our advertising efficiency. This includes IP addresses, browser type, internet service provider (ISP), referring pages, platform type, date/time stamp.[32]

100.    The Privacy Policy explains that it may use third-party advertising companies to serve ads on their behalf and that "[t]hese companies may employ cookies and action tags (also known as single pixel gifs or web beacons) to measure advertising effectiveness. Any information that these third parties collect via cookies and action tags is completely anonymous."[33] But this promise is false because the tracking technologies surreptitiously collect identifiable information, such as which page users are specifically viewing and what specific actions users are taking on the website, and transmit it to platforms like Google, Facebook, Amazon, and TikTok. These platforms, in turn, use this information to deliver targeted advertisements to specific individuals based on their unique browsing behavior—including to their personal Google and Facebook accounts, demonstrating that the information collected is not anonymous, but instead is specifically linked to individual users. Moreover, the Privacy Policy fails to disclose the true extent of the information collected and shared.

101.    By engaging in this improper sharing of information without Plaintiff's and Class members' consent, Defendants breached Plaintiff's and Class members' right to privacy and unlawfully disclosed their Private Information.

### H.    Defendants' Use of the Tracking Technologies Violates HIPAA

102.    Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[34]

---

[32] *Id.*
[33] *Id.*
[34] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

103.    Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

104.    HIPAA's Privacy Rule broadly defines protected health information ("PHI") as individually identifiable health information ("IIHI") that is "(i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

105.    IIHI is defined as "a subset of health information, ***including demographic information collected from an individual***" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103 (emphasis added).

106.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> …
>
> H.  Medical record numbers;
>
> …

J.   Account numbers;

…

M.  Device identifiers and serial numbers;

N.  Web Universal Resource Locators (URLs);

O.  Internet Protocol (IP) address numbers;

… and

R.  Any other unique identifying number, characteristic, or code…

45 C.F.R. § 164.514. Additionally, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

107.   The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of PHI and sets limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

108.   Even the fact that an individual is receiving a medical service, i.e., is a patient of a particular entity, can be PHI. The Department of Health and Human Services has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[35]

---

[35] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, HHS.GOV (last visited Oct.  4, 2023).

109. Consistent with this restriction, the HHS has issued marketing guidance that provides, "With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[36]

110. Here, Defendants provided patient information to third parties in violation of the Privacy Rule.

111. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

112. Defendants further failed to comply with other HIPAA safeguard regulations as follows:

      a. Disclosing Plaintiff's and Class Members' protected health information (PHI), such as unique user identifiers, information about the specific health-related pages viewed, and treatments or locations searched for, to third parties— including Meta, Google, Amazon, and TikTok—via tracking technologies, without obtaining required HIPAA-compliant authorization, alleged above.

---

[36] *Marketing*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html, HHS.GOV (last visited Oct. 19, 2023).

b. Failing to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. section 164.306(a)(1);

c. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

d. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. section 164.308(a)(6)(ii);

e. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. section 164.306(a)(2);

f. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. section 164.306(a)(3); and

g. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. section 164.530(c).

113. Defendants' placing a third-party tracking code on their Website is a violation of Plaintiff's and Class members' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation demonstrates Defendants' wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

### I.    *Defendants' Use of the Tracking Technologies Violates OCR Guidance*

114. In addition, the government has issued guidance warning that tracking technologies like the Tracking Technologies may run afoul of federal privacy law when installed on healthcare websites.

115. As mentioned previously, the HHS OCR has issued a Bulletin titled *Use of Online Tracking Technologies by HIPAA Covered Entities And Business Associates* which provides that

healthcare organizations regulated under the HIPAA may use third-party tracking tools, such as Google Analytics or the Tracking Technologies *only in a limited way*, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[37]

116.    According to the Bulletin, Defendants have violated HIPAA rules by implementing the Tracking Technologies.[38]

117.    The bulletin discusses the types of harm that disclosure may cause to the patient:

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[39]

118.    Commenting on a June 2022 report discussing the use of Tracking Technologies by hospitals and medical centers, David Holtzman, a health privacy consultant and a former senior privacy adviser in HHS OCR, which enforces HIPAA, stated, "I am deeply troubled by what [the hospitals] are doing with the capture of their data and the sharing of it … It is quite likely a HIPAA violation."[40]

---

[37] *See* HHS OCR Bulletin, *supra* n. 16.

[38] *See id.* ("disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures").

[39] *Id.* (emphasis added.)

[40] '*Deeply Troubled*': *Security experts worry about Facebook trackers on hospital sites*, ADVISORY BOARD, https://www.advisory.com/daily-briefing/2022/06/17/data-trackers (last visited Oct. 1, 2023).

119.    Plaintiff and Class members face the same risks warned of above.

120.    Defendants have shared Plaintiff's and Class members' IIHI and PHI, including: descriptions about medical conditions patients are seeking treatment for; insurance status; medical history; the names of their doctors; the frequency with which they take steps to obtain healthcare for certain conditions; and where they seek medical treatment. This information is, as described in the Bulletin, "highly sensitive."

121.    The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code.*[41]

122.    Crucially, the government's Bulletin continues:

> *All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, *when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.*[42]

123.    Defendants' sharing of Private Information to the Information Recipients violated Plaintiff's and Class Members' rights.

### J.    Defendants Violated Industry Standards

124.    It is a cardinal rule that a medical provider's duty of confidentiality is embedded in the physician-patient and hospital-patient relationship.

---

[41] *Id.* (emphasis added.)
[42] *Id.* (emphasis added.)

125.    Defendants' use of the Tracking Technologies violates Federal Trade Commission ("FTC") data security guidelines. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices.

126.    The FTC's October 2016 publication *Protecting Personal Information: A Guide for Business*[43] established cyber security guidelines for businesses.

127.    These guidelines state that businesses should protect the personal patient information they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network vulnerabilities; and implement policies to correct any security problems.

128.    Defendants failed to implement these basic, industry-wide data security practices.

### K.    Users' Reasonable Expectation of Privacy

129.    Plaintiff and Class members were aware of Defendants' duty of confidentiality when they sought medical services from Defendants.

130.    Plaintiff had no knowledge of Defendants' use of pixels, no knowledge of how tracking technologies like pixels work in general, and no expectation that information about her activity on Defendants' Website would be made available to third parties

131.    Indeed, at all times when Plaintiff and Class members provided their IIHI and PHI to Defendants, they each had a reasonable expectation that the information would remain confidential and that Defendants would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

---

[43] *Protecting Personal Information A Guide for Business*, FTC.gov, *available at* https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited March 31, 2025).

132.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

133.    For example, a recent Consumer Reports study shows that 92% of Americans believe that Internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[44]

134.    Personal data privacy and obtaining consent to share Private Information are material to Plaintiff and Class members.

### L.    IP Addresses are Protected Health Information

135.    Defendants improperly disclosed Plaintiff's and Class members' computer IP addresses to the Information Recipients through their use of the Tracking Technologies *in addition to* unique personal identifiers such as phone numbers, email addresses, dates of birth, services selected, medical conditions, treatments, provider information, and appointment information.

136.    An IP address is a number that identifies the address of a device connected to the Internet.

137.    IP addresses are used to identify and route communications on the Internet.

138.    IP addresses of individual Internet users are used by Internet service providers, websites, and third-party tracking companies to facilitate and track Internet communications.

---

[44] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/, CONSUMERREPORTS.ORG (last visited March 31, 2025).

139.    Facebook tracks every IP address ever associated with a Facebook user (and with non-users through shadow profiles). Google also tracks IP addresses associated with Internet users.

140.    Facebook, Google, and other third-party marketing companies track IP addresses for targeting individual homes and their occupants with advertising.

141.    Under HIPAA, an IP address is considered personally identifiable information, defining personally identifiable information as including "any unique identifying number, characteristic or code" and specifically listing IP addresses among examples. 45 C.F.R. § 164.514 (2).

142.    HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

143.    Consequently, Defendants' disclosure of Plaintiff's and Class Members' IP addresses violated HIPAA and industry-wide privacy standards.

### M.    *Defendants Benefitted from and Were Enriched by the Use of the Tracking Technologies that Enabled the Unauthorized Disclosures Alleged Herein*

144.    The purpose of the Tracking Technologies and other tracking technologies on Defendants' Website was to improve marketing and thereby boost revenues.

145.    In exchange for disclosing the Private Information of their accountholders and patients, Defendants are compensated by the Information Recipients in the form of enhanced advertising services and more cost-efficient marketing on their platform.

146.    Retargeting is a form of online marketing that targets users with ads based on previous Internet communications and interactions.

147. Defendants retargeted patients and potential patients to get more people to use their services. These patients include Plaintiff and Class members.

148. Thus, utilizing the Tracking Technologies benefits Defendants by, among other things, reducing the cost of advertising and retargeting.

149. Moreover, Plaintiff's and Class members' Private Information had value and Defendants' disclosure and interception harmed Plaintiff and the Class.

150. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

151. The value of health data in particular is well-known and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 in which it described the extensive market for health data, observing that the market for information was both lucrative and a significant risk to privacy.[45]

152. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[46]

153. Tech companies are under particular scrutiny because they already have access to a massive trove of information about people, which they use to serve their own purposes, including potentially micro-targeting advertisements to people with certain health conditions.

---

[45] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry* (Jan. 9, 2017), Time.com, *available at* https://time.com/4588104/medical-data-industry/ (last visited Aug. 5, 2025).

[46] *See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data* (Dec. 18, 2019), CNBC.com, *available at* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited Aug. 5, 2025).

154. Policymakers are proactively calling for a revision and potential upgrade of the HIPAA privacy rules out of concern for what might happen as tech companies continue to march into the medical sector.[47]

155. Private Information is also a valuable commodity to identity thieves. As the FTC recognizes, identity thieves can use Private Information to commit an array of crimes that include identity theft and medical and financial fraud.[48] A robust "cyber black market" exists where criminals openly post stolen IIHI and PHI on multiple underground Internet websites, commonly referred to as the dark web.

156. While credit card information and associated IIHI can sell for as little as $1–$2 on the black market, PHI can sell for as much as $363.[49]

157. PHI is particularly valuable because criminals can use it to target victims with frauds that take advantage of their medical conditions.

158. PHI can also be used to create fraudulent insurance claims, can facilitate the purchase and resale of medical equipment, and it can help criminals gain access to prescriptions for illegal use or sale.

159. Medical identity theft can result in inaccuracies in medical records, costly false claims, and life-threatening consequences. If a victim's health information is commingled with other records, it can lead to misdiagnoses or mistreatment.

---

[47] *Id.*

[48] Federal Trade Commission, *Warning Signs of Identity Theft,* FTC.gov*, available at* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited Aug. 5, 2025).

[49] Center for Internet Security, *Data Breaches: In the Healthcare Sector,* CIsecurity.org, *available at* https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/ (last visited Aug. 5, 2025).

160.    The FBI Cyber Division issued a Private Industry Notification on April 8, 2014, that advised the following:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.[50]

161.    Cybercriminals often trade stolen Private Information on the black market for years following a breach or disclosure. Stolen Private Information can be posted on the Internet, making it publicly available.

162.    Defendants gave away Plaintiff's and Class members' communications and transactions on its Website without permission.

163.    The unauthorized access to Plaintiff's and Class members' private and Personal Information has diminished the value of that information, resulting in harm to Website users, including Plaintiff and Class members.

164.    Plaintiff suffered damages in the form of (a) invasion of privacy; (b) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the invasion of privacy; (c) diminution of value of the Private Information; (d) statutory damages; (e) the continued and ongoing risk to her Private Information; (f) lost benefit of the bargain; and (g) the continued and ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information she communicated to Defendants via the Website.

---

[50] FBI Cyber Division, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (Apr. 8, 2014), *available at* https://nsarchive.gwu.edu/sites/default/files/documents/5986979/National-Security-Archive-Department-of-Justice.pdf.

165. Plaintiff has a continuing interest in ensuring that future communications with Defendants are protected and safeguarded from future unauthorized disclosure.

## TOLLING

166. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff did not know—and had no way of knowing—that her Private Information was intercepted and unlawfully disclosed to the Information Recipients because Defendants kept this information secret.

## CLASS ALLEGATIONS

167. This action is brought by the named Plaintiff on her behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

168. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All persons residing in the United States who used Defendants' Website and whose Private Information was disclosed to the Information Recipients without their consent.

169. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

170. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

171. Numerosity. The Class is so numerous that the individual joinder of all members is impracticable. There are at least 600,000 patients that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

172.    Commonality. Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class members. These common questions include, but are not limited to, the following:

a)    Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class members;

b)    Whether Defendants had duties not to disclose the Private Information of Plaintiff and Class members to unauthorized third parties;

c)    Whether Defendants violated their own Privacy Policy by disclosing the Private Information of Plaintiff and Class members to the Information Recipients;

d)    Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class members that their Private Information would be disclosed to third parties;

e)    Whether Defendants violated the law by failing to promptly notify Plaintiff and Class members that their Private Information was being disclosed without their consent;

f)    Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of users' Private Information;

g)    Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Information belonging to Plaintiff and Class members free from unauthorized disclosure;

h)    Whether Defendants violated the statutes asserted as claims in this Complaint;

i)    Whether Plaintiff and Class members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

j)      Whether Defendants knowingly made false representations as to their data security and/or Privacy Policy practices;

k)      Whether Defendants knowingly omitted material representations with respect to their data security and/or Privacy Policy practices; and

l)      Whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Private Information.

173.    Typicality. Plaintiff's claims are typical of those of other Class members because Plaintiff's Private Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Tracking Technologies.

174.    Adequacy. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

175.    Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class members in that Plaintiff's and Class members' data was unlawfully stored and disclosed to unauthorized third parties, including the Information Recipients, in the same way. The common issues arising from Defendants' conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

176. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

177. Defendants have acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

178. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information and not disclosing it to unauthorized third parties;

b) Whether Defendants breached a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c) Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendants adequately and accurately informed Plaintiff and Class members that their Private Information would be disclosed to third parties;

e) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f) Whether Class members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

179. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class members' names and addresses affected by the unauthorized disclosures that have taken place. Class members have already been preliminarily identified and sent Notice by Defendants.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (*On behalf of Plaintiff & the Nationwide Class*)

180. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

181. Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Defendants owed, and continue to owe, a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information.

182. Defendants breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' Private Information from unauthorized disclosure.

183. It was reasonably foreseeable that Defendants' failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' Private Information through their use of the Tracking Technologies would result in unauthorized third parties, such as the Information Recipients, gaining access to such Private Information for no lawful purpose.

184. Defendants' duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class members' Private Information arose due to the special relationship that existed between Defendants and their patients, which is recognized by statute, regulations, and the common law.

185. In addition, Defendants had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

186. Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information. Defendants' misconduct included the failure to (1) secure Plaintiff's and Class members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Tracking Technologies.

187. As a direct result of Defendants' breach of their duty of confidentiality and privacy and the disclosure of Plaintiff's and Class members' Private Information, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased

infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

188.    Defendants' wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class members' Private Information constituted (and continue to constitute) negligence at common law.

189.    Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

## COUNT II
## INVASION OF PRIVACY
### (*On behalf of Plaintiff & the Nationwide Class*)

190.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

191.    The highly sensitive and personal Private Information of Plaintiff and Class members consists of private and confidential facts and information regarding Plaintiff's and Class members' health that were never intended to be shared beyond private communications on the Website and the consideration of health professionals.

192.    Plaintiff and Class members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this Information against disclosure to unauthorized third parties, including the Information Recipients.

193.    Defendants owed a duty to Plaintiff and Class members to keep their Private Information confidential.

194.    Defendants' unauthorized disclosure of Plaintiff's and Class members' Private Information to the Information Recipients, third-party tech and marketing giants, is highly offensive to a reasonable person.

195. Defendants' willful and intentional disclosure of Plaintiff's and Class members' Private Information constitutes an intentional interference with Plaintiff's and Class members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

196. Defendants' conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class members' privacy because Defendants facilitated the Information Recipients' simultaneous eavesdropping and wiretapping of confidential communications.

197. Defendants failed to protect Plaintiff's and Class members' Private Information and acted knowingly when they installed the Tracking Technologies onto the Website because the purpose of the Tracking Technologies is to track and disseminate individual's communications on the Website for the purpose of marketing and advertising.

198. Because Defendants intentionally and willfully incorporated the Tracking Technologies into the Website and encouraged individuals to use and interact with the Website and the health services thereon, Defendants had notice and knew that their practices would cause injury to Plaintiff and the Class.

199. As a proximate result of Defendants' acts and omissions, the private and sensitive Private Information, including the IIHI and PHI of Plaintiff and Class members, was disclosed to unauthorized third parties, causing Plaintiff and the Class to suffer damages.

200. Plaintiff, on behalf of herself and Class members, seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, loss of time and opportunity costs, lost benefit of the bargain, plus pre-judgment interest and costs.

201.    Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendants and still in the possession of the Information Recipients, and the wrongful disclosure of the Private Information cannot be undone.

202.    Plaintiff and Class members have no adequate remedy at law for the injuries relating to Defendants' and unauthorized third parties' continued possession of their sensitive and confidential Private Information. A judgment for monetary damages will not undo Defendants' disclosure of the Private Information to unauthorized third parties who, upon information and belief, continue to possess and utilize the Private Information.

203.    Plaintiff, on behalf of herself and Class members, further seeks injunctive relief to enjoin Defendants from intruding into the privacy and confidentiality of Plaintiff's and Class members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT III
### BREACH OF CONFIDENCE
*(On behalf of Plaintiff & the Nationwide Class)*

204.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

205.     Possessors of non-public medical information, such as Defendants, have a duty to keep such medical information completely confidential.

206.    Plaintiff and Class members had reasonable expectations of privacy in the responses and communications entrusted to Defendants through their Website, which included highly sensitive Private Information.

207.    Contrary to their duties as telehealth institutions and their express promises of confidentiality, Defendants installed the Tracking Technologies to disclose and transmit to third parties Plaintiff's and Class members' Private Information, including data relating to Plaintiff's and Class members' health.

208.    These disclosures were made without Plaintiff's or Class members' knowledge, consent, or authorization.

209.    The third-party recipients included, but may not be limited to, the Information Recipients.

210.    As a direct and proximate cause of Defendants' unauthorized disclosures of Plaintiff's and Class members' Private Information, Plaintiff and Class members were damaged by Defendants' breach of confidentiality in that (a) sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private; (b) Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Defendants eroded the essential confidential nature of health services that Plaintiff and Class members participated in; (d) general damages for invasion of their rights in an amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the unauthorized use of something of value (the highly sensitive Private Information) that belonged to Plaintiff and Class members and the obtaining of a benefit therefrom without Plaintiff's and Class members' knowledge or informed consent and without compensation to Plaintiff or Class members for the unauthorized use of such data; (g) diminishment of the value of Plaintiff's and Class members' Private Information; and (h) violation of property rights Plaintiff and Class members have in their Private Information.

## COUNT IV
## UNJUST ENRICHMENT
### (*On behalf of Plaintiff & the Nationwide Class*)

211.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

212.    Defendants benefitted from the use of Plaintiff's and Class members' Private Information and unjustly retained those benefits at Plaintiff's and Class members' expense.

213.    Plaintiff and Class members conferred a benefit upon Defendants in the form of the monetizable Private Information that Defendants collected from them and disclosed to third parties, including the Information Recipients, without authorization and proper compensation.

214.    Defendants consciously collected and used this information for their own gain, providing Defendants with economic, intangible, and other benefits, including substantial monetary compensation.

215.    Defendants unjustly retained those benefits at the expense of Plaintiff and Class members because Defendants' conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff or Class members.

216.    The benefits that Defendants derived from Plaintiff and Class members were not offered by Plaintiff or Class members gratuitously and, thus, rightly belongs to Plaintiff and Class members. It would be inequitable under unjust enrichment principles for Defendants to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

217.    Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds that Defendants received, and such other relief as the Court may deem just and proper.

**COUNT V**
**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
**18 U.S.C. § 2511(1)** *et seq.*
**(*On behalf of Plaintiff & the Nationwide Class*)**

218.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

219.    The ECPA protects both sent and received communications.

220.    The ECPA, specifically 18 U.S.C. § 2520(a), provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

221.    The transmissions of Plaintiff's and Class members' Private Information to Defendants via Defendants' Website is a "communication" under the ECPA's definition under 18 U.S.C. § 2510(12).

222.    The transmission of Private Information between Plaintiff and Class members and Defendants via their Website are "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

223.    The ECPA defines "content" when used with respect to electronic communications to "includ[e] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

224.    The ECPA defines "interception" as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

225. The ECPA defines "electronic, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class members' browsers;

b. Plaintiff's and Class members' computing devices;

c. Defendants' web-servers; and

d. The Tracking Technologies deployed by Defendants to effectuate the sending and acquisition of user and patient sensitive communications.

226. By utilizing and embedding the Tracking Technologies and Conversions API on their Website and/or servers, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class members, in violation of 18 U.S.C. § 2511(1)(a).

227. Specifically, Defendants intercepted Plaintiff's and Class members' electronic communications via the Tracking Technologies, which tracked, stored, and unlawfully disclosed Plaintiff's and Class members' Private Information to the Information Recipients.

228. Defendants' intercepted communications included, but are not limited to, communications to/from Plaintiff and Class members regarding IIHI and PHI, including IP address, Google account information, and health information relevant to the screenings and treatment plans in which Plaintiff and Class members participated.

229. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class members to the Information Recipients and, potentially, other third parties, while knowing or having reason to know that the information was obtained

through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

230. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class members, while knowing or having reason to know that the Information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

231. Defendants intentionally intercepted the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

232. Defendants intentionally used the wire or electronic communications to increase its profit margins. Defendants specifically used the Tracking Technologies to track and utilize Plaintiff's and Class members' Private Information for its own financial benefit.

233. Defendants were not acting under color of law to intercept Plaintiff's and Class members' wire or electronic communications.

234. Plaintiff and Class members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy via the Tracking Technologies.

235. Any purported consent that Defendants received from Plaintiff and Class members was not valid.

236. In acquiring and sending the content of Plaintiff's and Class members' communications relating to the browsing of Defendants' Website, creation of accounts, participation in Defendants' health screenings, and/or purchasing a subscription plan, Defendants'

purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person.

## COUNT VI

### VIOLATION OF THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT ("WESCA") 18 Pa.C.S. § 5701, *et seq.* (*On behalf of Plaintiff & the Nationwide Class*)

237.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

238.    The WESCA, codified at 18 Pa. Cons. Stat. § 5701 et seq., makes it unlawful for any person to intentionally intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept any wire, electronic, or oral communication without the consent of all parties to the communication. *See* 18 Pa. Cons. Stat. § 5703.

239.    The term "intercept" is defined in the statute as the "acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device," and "contents" includes any "information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

240.    WESCA is a statute that requires all parties to a communication to give express consent before any recording or interception may lawfully occur. *See* § 18 Pa. Cons. Stat. 5704(4) (exceptions to prohibition of interception and disclosure of communications only where "all parties" consent to the communication).

241.    At all relevant times, Defendants operated and maintained a Website that required prospective customers and patients to provide individually identifiable health information and

other sensitive data for the purpose of using medical and other related services, and scheduling appointments.

242.    Defendants intentionally installed and utilized Tracking Technologies across the Website and its subpages.

243.    These Tracking Technologies, by design and implementation, intercepted, recorded, and transmitted the private electronic communications between Plaintiff (and Class members) and the Defendants—including sensitive health information, identifiers, communications about medical conditions, and website interactions—to Information Recipients.

244.    The interception and disclosure of these communications occurred contemporaneously with Plaintiff's and Class members' website usage, and the communication contents were acquired both by Defendants and by the third-party Information Recipients, without Plaintiff's or Class members' express consent.

245.    As a result of Defendants' unlawful interception, Plaintiff and Class members suffered a violation of WESCA, sufficient to confer Article III standing. Unless enjoined, Defendants will continue to commit the illegal acts alleged here. Plaintiff and Class members continue to be at risk because they frequently use the Internet to search for information about products or services. They continue to desire to use the Internet for that purpose, including for the purpose of acquiring healthcare services online. Plaintiff and Class members also desire to use the Website in the future but have no practical way to know if their website communications will be monitored or recorded by the Information Recipients.

246.    Plaintiff and Class members seek all relief available under 18 Pa. Cons. Stat. § 5725(a), including actual damages, statutory damages, punitive damages, attorney's fees, and costs.

## COUNT VII

## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("UTPCPL")
### 73 P.S. § 201-1 *et seq*.
#### (*On behalf of Plaintiff and Nationwide Class*)

247. Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

248. The UTPCPL imposes liability for any "unfair methods of competition" and "unfair or deceptive acts or practices" that involves engaging in any "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." *See* 73 P.S. § 201-2(4); § 201-3(a).

249. Defendants, through their Website and Privacy Policy, represented to Plaintiff and Class members that their confidential and personal information would be kept private and anonymous. But Defendants intentionally installed Tracking Technologies that surreptitiously collected and disclosed Plaintiff's and Class member's identifiable information, including which pages they were specifically viewing and what specific actions they were taking on that Website.

250. Defendants failed to clearly and prominently disclose the use, purposes, and privacy risks of these Tracking Technologies or the full nature and extent of their data-sharing practices with Information Recipients. Defendants' Privacy Policy was ambiguous and misleading in its description of what data would be collected and with whom it would be shared.

251. Accordingly, Plaintiff and the Class were injured and have suffered damages, as described above, from Defendants' unlawful disclosure of Plaintiff's and Class member's private identifiable information, and therefore seek relief under 73 P.S. § 201-9.2, including actual damages, statutory damages, additional damages as the Court deems proper, injunctive relief, attorney's fees, and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the proposed Class, respectfully requests that this Court enter an Order:

a)   Certifying this case as a class action on behalf of the Nationwide Class defined above, appointing Plaintiff as representative of the Class, and appointing their counsel as Class Counsel;

b)   For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or unauthorized disclosure of Plaintiff's and Class members' Private Information;

c)   For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class members;

d)   For an award of damages, including but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

e)   For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

f)   Pre- and post-judgment interest on any amounts awarded; and

g)   Such other and further relief as this court may deem just and proper.

Dated: October 17, 2025              Respectfully submitted,

*/s/ Beena M. McDonald*
Steven A. Schwartz (PA Bar ID No. 50579)
Beena M. McDonald (PA Bar ID No. 83315)
Alex M. Kashurba (PA Bar ID No. 319003)
Marissa N. Pembroke (PA Bar ID No. 330494)
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

361 West Lancaster Avenue Haverford,
Pennsylvania 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
sas@chimicles.com
bmm@chimicles.com
amk@chimicles.com
mnp@chimicles.com

**MIGLIACCIO & RATHOD, LLP**
Nicholas A. Migliaccio*
Jason S. Rathod*
Bryan G. Faubus*
Zachary O. Chambers*
Tel: 202.470.3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
bfaubus@classlawdc.com
zchambers@classlawdc.com
*pro hac vice anticipated*

*Attorneys for Plaintiff & the Putative Class*